***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Stanback and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence or rehear the parties or their representatives. Therefore, the Full Commission enters the following Opinion and Order.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties at the hearing and in a Pre-Trial Agreement dated February 18, 2002, as:
 STIPULATIONS
1. At all relevant times, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. Builders Mutual Insurance Company is the workers' compensation insurance carrier for defendant-employer.
3. Plaintiff's average weekly wage is subject to determination.
4. Plaintiff was injured on December 18, 2000 when he fell approximately fifteen to sixteen feet from a roof, resulting in various injuries.
5. Documents stipulated into evidence include the following:
Stipulated Exhibit #1 Plaintiff's medical records
6. The depositions of Dr. Chason Hayes, Dr. William Lehman and Dr. Thomas Fleisher have been received and admitted into evidence.
7. The issues presented for determination by the undersigned are:
 (a) Whether an employee/employer relationship existed between plaintiff and defendant-employer on the date of injury?
 (b) If so, what was plaintiff's average weekly wage and to what benefits is plaintiff entitled?
 ***********
Based upon all of the competent evidence presented, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner, plaintiff was a twenty-eight year old married male. There are two minor children living with plaintiff and his wife.
2. Defendant-Employer is a construction company involved in the framing of residential homes. Dwayne Carpenter is the owner of the business and he regularly employs three or more employees. In his job duties, Mr. Carpenter does perform some framing and regularly visits the job sites. Tim Williams is the foreman of Mr. Carpenter's framing crew and his job duties require him to oversee the day-to-day operations of the crew. Mr. Williams does not have the authority to hire employees without the consent of Mr. Carpenter, but he does have the authority to fire employees without consulting Mr. Carpenter if it is deemed necessary.
3. Plaintiff previously worked for defendant-employer on two separate occasions, once in 1995 and once in 1998. Plaintiff worked for defendant-employer from 1995 to 1997 and then left to perform commercial construction work. He returned for a brief period in 1998, however, he left to find work elsewhere. Prior to leaving defendant-employer in 1998, plaintiff had borrowed $300.00 from Mr. Carpenter. Plaintiff did not repay Mr. Carpenter following his separation from defendant-employer.
4. Plaintiff contacted Mr. Carpenter on December 16, 2000, which was a Saturday.
Plaintiff inquired as to whether Mr. Carpenter needed any additional help because plaintiff needed money for the upcoming holiday. Mr. Carpenter informed plaintiff that he did not have a job available but that he would check on Monday with his crew and other general contractors to see if anything was available. Plaintiff offered to work for $10.00 per hour, payable in cash "under the table", so that plaintiff could pay Mr. Carpenter the money that was owed to him. This offer was not accepted or acceptable to Mr. Carpenter.
5. On the morning of Monday, December 18, 2000, plaintiff contacted Mr. Carpenter to again inquire as to the availability of work. At that time Mr. Carpenter still had not talked with his crew to determine if any help was needed on the job site, and likewise did not offer plaintiff a job.
6. Just before lunchtime on December 18, 2000, plaintiff went to visit the job site on which defendant-employer was performing work. It was customary for plaintiff to occasionally visit the job site to talk with friends. Employees on site included Tim Williams, and four other employees, Charles Ellis, Ronald Taylor, David Anthony "Tony" Williams and Michael Williams. (Tony and Michael Williams are brothers but they are not related to Tim Williams.) The plaintiff, Mr. Ellis and the Williams brothers have known one another for several years.
7. At the time of the hearing before the deputy commissioner, Charles Ellis no longer worked for the defendant — employer, Michael Williams had been terminated two weeks prior to the hearing, and Tony Williams had been terminated for showing up at work while intoxicated.
8. When Tim Williams saw plaintiff arrive on the job site, he contacted Mr. Carpenter by phone to ask whether he had hired plaintiff. Mr. Carpenter stated that he had not. Tim Williams then instructed plaintiff that there was no work available. Tim Williams also indicated to Michael Williams that he had no intentions of hiring plaintiff.
9. The crew stopped working for a lunch break, and plaintiff accompanied Mr. Ellis to a local restaurant for lunch. When the crew returned to the job site after lunch, one of the employees was unable to continue working because of a family emergency. Despite this, there was no need to hire plaintiff because the remaining members of the crew could complete the job, and Tim Williams did not have the authority to hire plaintiff on the spot. In fact, Tim Williams would not have hired plaintiff without first consulting Mr. Carpenter even if he had such authority given the fact that plaintiff owed Mr. Carpenter money. Tim Williams did not indicate to plaintiff that he was hired, and there were no discussions of length of employment or rate of pay.
10. At some point after lunch, plaintiff went home to retrieve his tool bag. When he returned, he assisted Mr. Ellis while Mr. Ellis cut rafters for the second floor of the house. Some time later, Tim Williams called all members of the crew to go to the second floor to assist in the process of pulling the rafters up to that floor. Though he was not specifically called to help, plaintiff went up with the rest of the crew.
11. While on the second floor, plaintiff lost his balance and fell to the ground where he landed on both his feet, sustaining injuries to both ankles. He was taken immediately to Springs Memorial Hospital.
12. With respect to the issue of whether plaintiff was an employee on the date of injury, the Full Commission notes that when plaintiff presented to Springs Memorial Hospital on December 18, 2000, he noted on the admission form that he was unemployed. Furthermore, on December 19, 2000, the medical records from Springs Memorial Hospital indicate that there was a discussion of the method of payment for plaintiff's treatment. In that discussion, workers' compensation was not mentioned, and plaintiff was given information for alternative methods of payment such as Medicare, Vocational Rehabilitation and other organizations.
13. On December 20, 2000, it was noted that plaintiff was not eligible for workers' compensation and that he was to interview with the Social Security Administration on January 9, 2001, to determine his eligibility. The Full Commission finds that these discussions would not have taken place if plaintiff had relayed that he was employed and that the injury took place while he was working.
14. While plaintiff was in the hospital he was treated by Dr. Thomas Fleischer, an orthopaedic surgeon. Dr. Fleischer performed surgery in the form of open reduction internal fixation of the right calcaneus as well as the left distal tibia on December 18, 2000.
15. Plaintiff continued to treat with Dr. Fleischer and Dr. William Lehman, an orthopaedic surgeon in the same practice as Dr. Fleischer, following his discharge from the hospital. The medical records reveal, and Dr. Fleischer's testimony indicates, that plaintiff often requested significant amount of pain medication. Dr. Fleischer was unwilling to prescribe more powerful narcotic pain medication, and plaintiff's attitude towards Dr. Fleischer's treatment grew more antagonistic, including plaintiff threatening a staff member.
16. On January 4, 2001, plaintiff contacted Dr. Fleischer by phone and stated that the Vicodin that had been prescribed the previous day was not strong enough. Dr. Fleischer refused to prescribe additional pain medication, and plaintiff terminated the conversation by hanging up on Dr. Fleischer.
17. On January 5, 2001, plaintiff presented to Palmetto Physical Medicine and Rehabilitation and received a prescription of thirty tablets of Oxycontin. On January 13, 2001, he returned to Dr. Fleischer and did not mention the fact that he had received medication elsewhere. Dr. Fleischer prescribed additional Vicodin for pain management. On January 15, 2001, plaintiff returned to Palmetto Physical Medicine and Rehabilitation and, without informing that doctor of his recent visit to Dr. Fleischer, received an additional fifty tablets of Oxycontin.
18. It was not until sometime in late January that Mr. Carpenter received notification that plaintiff intended to pursue his injuries as being related to his alleged employment. This notification came in the form of a letter from plaintiff's attorney.
19. On January 31, 2001, Dr. Fleischer recommended that plaintiff begin to bear weight and participate in physical therapy. On March 6, 2001, he noted that plaintiff was doing "really well," that he should continue to bear weight and that he should follow-up in four to six weeks. That was the last time that plaintiff presented to Dr. Fleischer for treatment.
20. Plaintiff then began treating with Dr. Joseph King and Dr. Alan Hayes of Carolina Bone and Joint. On April 27, 2001, plaintiff presented to Dr. King requesting more Oxycontin, however, Dr. King noted that it was necessary to wean plaintiff from this medication.
21. Dr. Hayes subsequently performed surgery in August of 2001 during which he removed the hardware and screws in plaintiff's left foot. The hardware in plaintiff's right foot was left in place. In February of 2002, plaintiff underwent another fusion of his left ankle.
22. Plaintiff has not worked since the date of his injury, and Dr. Hayes has indicated that plaintiff has not reached maximum medical improvement from his injury.
23. The Full Commission finds that on December 18, 2000, plaintiff was not an employee of the defendant-employer.
 ***********
The foregoing findings of fact and conclusions of law engender the following additional:
 CONCLUSIONS OF LAW
1. On December 18, 2000, an employee/employer relationship did not exist between plaintiff and defendant-employer. N.C. Gen. Stat. §97-2(2).
2. Plaintiff is not entitled to workers' compensation benefits for the injuries he received on December 18, 2000. N.C. Gen. Stat. § 97-2(2).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Under the law, plaintiff's claim must be, and the same is hereby, DENIED.
2. Each side shall bear its own costs.
This the 6th day of October 2003.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER